STATE OF NEBRASKA, APPELLEE, v. CHICAGO AND NORTH WESTERN RAILWAY COMPANY, APPELLANT.

25 N. W. 2d 824

FILED JANUARY 17, 1947. No. 32173.

*Wymer Dressler* and *R. D. Neeley,* for appellant.

*Walter R. Johnson, Attorney General,* and *Erwin A. Jones,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and ANKENY, District Judge.

CARTER, J.

This is a suit brought by the Attorney General in the name of the State to obtain an order enjoining the defendant railroad company from continuing to operate certain main-line switch stands by the use of reflectorized equipment alleged to be in violation of section 74-581, R. S. 1943. The trial court entered an order enjoining the use of reflectorized discs on switch stands leading from all main-line tracks for the reason that they are in violation of the aforesaid statute. The railroad company appeals.

The record shows that the defendant operates a main-line railroad which passes through Whitney, Crawford,

Fort Robinson, Glen, Andrews, Harrison, and Coffee Siding, all in Nebraska, at each of which points switch stands leading from the main track exist. In 1942, the railroad company replaced the then existing oil-burning switch lights with reflectorized lamps whose source of light was obtained from light beams thrown upon it, such as those thrown by the headlights on the railroad's locomotives. It is the position of the State that the new reflectorized lamps are unlawful equipment under the provisions of section 74-581, R. S. 1943. This section is as follows:

"Every person, firm, corporation, lessee or receiver of any railroad, engaged in the business of transportation in this state, shall equip with proper lights all switch stands to each and every switch leading from all main tracks of any such road, on which trains are generally operated at night, except lines fully equipped with automatic block signals. The lights upon such switch stands shall be in good condition constantly, and shall be lighted and kept burning between the time of sundown and sunrise, and at such other times when, by reason of excessively foggy weather, the condition of such lights or signals would render it unsafe both for the employees of such railroad and for the general public."

Section 74-582, R. S. 1943, provides for a penalty of five dollars against any railroad company permitting any violation of the foregoing section on the part of any employee.

It is first contended by the railroad company that section 74-581, R. S. 1943, is so indefinite and uncertain of meaning as to be void as a penal statute under the due process clauses of the state and federal Constitutions. This contention is based upon the assertion that the statute provides for no fixed standard of guilt upon which the penalty can be assessed. It is the fundamental rule, and one upon which the railroad company relies, that no one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed by reasonably explicit language what conduct on their part

will render them liable to its penalties, and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ on its application, violates the essentials of constitutional provisions guaranteeing due process of law. It is urged by the railroad company that the requirement of the statute being considered that all switch stands leading from main tracks be equipped with "proper lights" does not fix an ascertainable standard of guilt and is inadequate to inform persons accused of a violation thereof of the nature of the accusation against them. Cases cited which tend to support the foregoing are Connally v. General Construction Co., 269 U. S. 385, 70 L. Ed. 322, 46 S. Ct. 126; Cline v. Frink Dairy Co., 274 U. S. 445, 71 L. Ed. 1146, 47 S. Ct. 681; Lanzetta v. New Jersey, 306 U. S. 451, 83 L. Ed. 888, 59 S. Ct. 618; State v. Keller, 108 Neb. 742, 189 N. W. 374; State ex rel. English v. Ruback, 135 Neb. 335, 281 N. W. 607. The foregoing cases, in our opinion, correctly reflect the law applicable to the statutes involved in those cases. And they might well reflect the law applicable in the present case if the words "proper lights" remained undefined and unexplained. We think other portions of the statute sufficiently define the term "proper lights" so as to eliminate the contention that what is lawful or unlawful under it must be left to individual judgment or conjecture.

Construing section 74-581, R. S. 1943, as a whole, it will be observed that the latter portion of the section limits and explains the words "proper lights" used in the fore part of the section. The requirement that the "proper lights" shall be lighted and kept burning between the times of sundown and sunrise, and at such other times when by reason of excessively foggy weather the condition of such lights or signals would render it unsafe both for the employees of such railroad and for the general public, clearly indicates that "proper lights" were intended to be any electric or combustion light. A reflectorized lamp certainly was not con-

templated when it was stated in the act that they should be "lighted" and "kept burning" between sundown and sunrise. We think the act does define the type of light that is to constitute a "proper light" and clearly a reflectorized lamp does not come within the statute. The act is not void for indefiniteness and uncertainty.

It is worthy of note that in the latter part of the section it is provided that switch-stand lights shall be lighted and kept burning between sundown and sunrise, and at such other times when by reason of foggy weather the condition of such lights or signals would render it unsafe for employees and the public. It is intimated that the use of the words "such lights or signals" supports the view advanced by the defendant. We think not. The words clearly refer to times other than between sundown and sunrise, and can only refer to daytime lights and signals not the subject of legislation in the act. It cannot be properly construed, therefore, as definitive of proper lights required between sundown and sunrise.

The defendant cites various definitions from a recognized dictionary of the words "burn" and "burning," to show that they are sometimes used to mean "aglow," "glow like fire," and "shining." But it is a fundamental rule of statutory construction that the usual and ordinary meaning of words will be used in construing the meaning of a statute. The words "and shall be lighted and kept burning between the time of sundown and sunrise" do not indicate any intent to adopt any meaning other than the usual and ordinary meaning of the terms used. Special or technical definitions of common words will not be applied as a basis for declaring legislative acts void for indefiniteness and uncertainty.

It is urged that, even if the statute was valid when passed, it is now invalid because of changed conditions bearing upon the subject of the legislation. We agree that a statute, although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation. Nashville, C. & St. L. Ry. v. Walters, 294 U. S. 405, 79

L. Ed. 949, 55 S. Ct. 486; Hubbell Bank v. Bryan, 124 Neb. 51, 245 N. W. 20. This requires a determination as to whether the present statute is arbitrary. If there are no reasonable differences between what is lawful and what is enacted as unlawful, the charge of arbitrariness and resulting unconstitutionality would have force.

At the time the act in question was first enacted, reflectorized lamps were unknown to the railroad industry. Their subsequent development and use by many railroads in many states leads to the contention that to construe the statute as urged by the state is to prevent progress by asserting distinctions having no differences in fact, and to sustain the statute when the arbitrariness thus created requires a declaration of invalidity. There is evidence in the record that the oil-burning lamp is superior from the standpoint of safety to employees and to the public. It is pointed out that the reflectorized light can be seen only when light beams are cast upon it. When a locomotive approaches a reflectorized lamp, under good conditions, with the headlights now used on locomotives, it can be seen as well or better than an oil-burning lamp. But as soon as the locomotive passes the reflectorized lamp, the switchstand is in total darkness. Trainmen responsible for leaving switches properly lined when the train leaves a switching area assert that, with the switch stands completely dark, it is extremely difficult and somtimes impossible to perform their duty from the moving train. Difficulty in seeing reflectorized lamps on sharp curves is demonstrated because of the darkness of the reflectorized lamp until it is caught in the sweep of the locomotive headlight. Location of the switches on dark and stormy nights is rendered difficult by the use of reflectorized lamps. There is evidence that in storms and fog the oil-burning lamps are more efficient. There is evidence also that oil lamps free themselves from snow and sleet by the heat generated from the burning flame, while a reflectorized lamp has no such quality for maintaining its efficiency.

On the other hand, some of the foregoing testimony is disputed by the company's witnesses. The difficulties of maintenance of oil lamps, their tendency to smoke, the danger of going out from lack of oil, careless handling of switches, the vibrations of trains, high winds, moisture, and sudden temperature changes, are all pointed out in the record as inherent weaknesses in this type of lamp. Some of these statements, and particularly the degree of inefficiency testified to, are disputed by the State's evidence. It is not our province to determine the merit or demerit of the reflectorized lamp. All we are called upon to determine is whether there is sufficient reason to warrant the Legislature in providing for the use of "burning" lamps to the exclusion of "reflectorized" lamps or discs to escape a charge of arbitrariness. If there were no differences in the two types of lamps, it would be arbitrary to permit one and penalize the use of the other. It is clear from the evidence that there are many differences in the two types of lamps as they relate to the safety of employees and the public. That the Legislature intended the distinction made is evident from the further fact, appearing in the record, that the Legislature was urged to amend the act at the 1945 session of the Legislature to permit the use of reflectorized lamps. See L. B. 357, 1945 session, proposed and indefinitely postponed. Its refusal to amend the statute is evidence of a legislative intent to maintain the act in accordance with the interpretation which we here place upon it. Wayne County v. Auditor General, 250 Mich. 227, 229 N. W. 911; Blome Co. v. Ames, 365 Ill. 456, 6 N. E. 2d 841; 59 C. J., Statutes, § 609, p. 1030; 50 Am. Jur., Statutes, § 330, p. 322. There is ample evidence sufficient to avoid a charge of arbitrariness on the part of the Legislature in acting as it did. This being true, the statute is not vulnerable to attack on the ground that it is unreasonable and arbitrary legislation.

The railroad company asserts that the question of the right to use a reflectorized lamp at main-line switch stands

lies with the Nebraska State Railway Commission. This argument is completely answered in the last sentence of the constitutional provision creating the railway commission and defining its powers: "But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." Sec. 20, art. IV, of the Constitution. See, also, State ex rel. Missouri P. Ry. Co. v. Clarke, 98 Neb. 566, 153 N. W. 623; In re Yellow Cab & Baggage Co., 126 Neb. 138, 253 N. W. 80. The legislative act under consideration clearly deprives the Nebraska State Railway Commission of any power to act to the extent that it occupies the field.

The defendant railroad company urges that the remedy of injunction is not available in the present suit. It is the general rule that every government entrusted with powers and duties involving the public welfare has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other. In re Debs, 158 U. S. 564, 39 L. Ed. 1092, 15 S. Ct. 900. In State v. Pacific Express Co., 80 Neb. 823, 115 N. W. 619, the following quotation from Trust Co. of Georgia v. State, 109 Ga. 736, 35 S. E. 323, is cited with approval: "Our conclusion, therefore, both from reason and a decided weight of authority, is that the state, in her sovereign capacity, can appeal to the courts for relief by injunction, whenever either its property is involved, or public interests are threatened and jeopardized by any corporation, especially one of a public nature like a railroad company, seeking to transcend its powers, and to violate the public policy of the state." We recognize the general rule that acts punishable by fine will not ordinarily be enjoined. But this rule does not have the force of denying such a remedy in the prevention of public wrongs arising out of repeated violations of a penalty statute which harmfully affects the interests of the public. And this rule does not require that such acts should create a nuisance. Injunction is properly used for the protection of public rights, property, or welfare, whether or not such

acts violate a penalty statute and whether or not they constitute a nuisance. 28 A. Jur., Injunctions, § 151, p. 341; 43 C. J. S., Injunctions, § 152, p. 764.

In State v. Pacific Express Co., *supra,* the Attorney General sought to enjoin five railway express companies from violating a statute fixing rates for the transportation of merchandise by railway express. The question of the right to injunctive relief was there raised and decided. This court said, by adopting the language of the court in Attorney General v. Great Northern Ry. Co., 1 Dr. & Sm. (Eng.) 154, that: "A nuisance may be detrimental to the public or to an individual; and it is very usual for the Attorney-General to come forward for an injunction to restrain it, so far as it affects the public, just as an individual may apply for an injunction to restrain it; where it affects himself. It is true that every injury is not a nuisance; but the right of the public to be protected against injury by the information of the Attorney-General, is not confined to those injuries which come within the strict definition of a nuisance. Where it is the interest of the public to prevent an illegal act, such as this, being committed, it is competent for the Attorney-General to file an information to restrain it."

It is to the public interest that railroad companies comply with all valid safety regulations. The safety of the traveling public requires that such regulations be enforced. The public interest is just as great, if not greater, in the enforcement of safety regulations as in the enforcement of a rate fixing statute. Clearly, injunction is a proper remedy in the case at bar.

We find no error in the action of the trial court in enjoining the defendant from the use of reflectorized switch stands in violation of the cited statute.

AFFIRMED.